**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JOHN NICHOLAS, Derivatively on behalf of TELLABS, INC., | ) | Case No. |
| | ) | |
| Plaintiff, | ) | (Derivative Action) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. BIRCK, BO HEDFORS, FRANK IANNA, VINCENT D. KELLY, MICHAEL E. LAVIN, STEPHANIE PACE MARSHALL, GREGORY J. ROSSMAN, DENNIS F. STRIGL, JAN H. SUWINSKI, VINCENT H. TOBKIN, MIKEL H. WILLIAMS, LINDA W. KAHANGI, JOHN BROTS, ROGER J. HEINZ, JEAN K. HOLLEY, TIMOTHY J. WIGGINS and THOMAS P. MINICHIELLO, | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| Defendants, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| TELLABS, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

By and through his undersigned counsel, Plaintiff John Nicholas ("Plaintiff") brings this shareholder derivative action on behalf of Tellabs, Inc. ("Tellabs" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, insider trading, and unjust enrichment. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: a) review and analysis of public filings made by Tellabs and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on Tellabs' website concerning the Company's public statements; and d) review of other publicly available information concerning Tellabs and the Individual Defendants (defined herein).

## I.      INTRODUCTION

1.      From October 26, 2010 to July 27, 2012 (the "Relevant Period"), the Individual Defendants caused the Company to inflate its revenues by improperly recognizing revenue. As a result, Tellabs' stock price was artificially inflated. The insiders knew that the improper revenue recognition could not go on forever and Tellabs' stock price would eventually come back down. Nonetheless, to continue the appearance that the Company was trading at a low price, the Individual Defendants caused the Company to waste corporate assets and spend $50.9 million to repurchase 7.6 million shares in the open market at these inflated prices. At the same time, certain inside directors and officers were selling their personally held stock to pocket millions of dollars. When the market learned that Tellabs had filed with the SEC at least four quarters worth of false financial results and that it would be restating its financial statements (an admission that the financial statements were materially false), the stock price fell precipitously and the Company has suffered significant damages. This shareholder derivative complaint seeks to recover those damages and reform the Company's corporate governance.

2.     The Relevant Period began in the second half of 2010 when a combination of adverse factors led to a decline in the Company's business and revenue.  In a concerted effort to conceal this negative trend and prop up Tellabs' stock price, the Individual Defendants made, authorized, or failed to correct false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations and prospects.

3.     With the knowledge that:

a) the Company's Q4 2010 revenue guidance factored in a change to the distribution arrangement with a certain customer which would accelerate revenue recognition on substantial sales to Q4 2010 that otherwise would not have been recognized until Q1 2011;

b)  this out of the ordinary shift in revenue recognition from Q1 2011 masked that the Company's business and revenues were declining substantially faster in Q4 2010 than the Company had represented to the public;

c) the Company's North American business was slowing at a greater rate than the Company had represented to the public;

d) as a result of the above, the Individual Defendants' positive statements about the Company's business, operations and prospects lacked a reasonable basis and/or were materially false and/or misleading when made; and

e) even once the revenue recognition issues in Q4 2010 and Q1 2011 had been acknowledged, no changes in corporate governance were instituted to prevent the recurrence of such problems, resulting in additional revenue recognition issues in Q2 and Q3 2011, and necessitating multiple restatements of the false financial reports made for those quarters;

the Individual Defendants chose to participate in and allow the Company to engage in a scheme to mislead the investing public about Tellabs' current and future financial condition in order to artificially inflate the Company's stock price.

4.     In particular, on October 26, 2010, Tellabs announced its financial results for its Q3 2010 fiscal third quarter.  For Q3 2010, the Company reported revenue of $429.2 million, which represented the second consecutive quarter-over-quarter revenue increase.  In connection with the announcement of the Company's Q3 2010 financial results, the Company also provided revenue guidance for the Company's upcoming Q4 2010 financial results of $410 to $430 million.  This signaled Tellabs' anticipation that in Q4 2010, revenues would at best be flat or at worst decline slightly by $19.2 million (or 4.47%).

5.     On January 25, 2011, the Company issued a press release announcing its Q4 2010 financial results.  For Q4 2010, Tellabs reported revenue of $410.5 million, purportedly in line with the low end of its previously issued revenue guidance (of $410 to $430 million).  That same day, however, during a conference call to discuss Tellabs' Q4 2010 financial results, the Company additionally disclosed that "revenue in [Q4 2010] also reflected [Tellabs'] agreement with a North American customer to add a data product to other Tellabs' products already sold to that customer through a distributor" and that as "a result, [the Company had] recognized $20.8 million in revenue in [Q4 2010] that otherwise would have been recognized in the first quarter of 2011 [("Q1 2011")]."  Moreover, the Company admitted that when it "***set the guidance and provided it to [the investing public] in October [of 2010] . . . [Tellabs had] anticipate[d] the change in this distribution arrangement with the customer***."[1]

6.     When adjusting Q4 2010 revenue to remove this unusual and out of the ordinary shift in revenue recognition, after reporting revenue of $429.2 million for Q3 2010, ***the Company's revenues actually substantially declined by $40 million, or 9.32%, to only $389.7 million in Q4 2010***.

7.     On this news, shares of Tellabs declined $1.35 per share, or almost 20%, to close on January 25, 2011, at $5.69 per share, on unusually heavy volume.

---

[1]     Unless noted otherwise, all emphasis is added.

8.     Thereafter, on April 26, 2011, the Company announced its financial results for Q1 2011.  The Company's Q1 2011 financial results reflected substantial weakness in its North American business as a result of slowing sales to one of its primary customers.

9.     On this news, shares of Tellabs declined $0.49 per share, or almost 10%, to close on April 26, 2011, at $4.90 per share, on unusually heavy volume.

10.     Despite the devastating effect on its stock price of Tellabs' improper recognition of revenue with respect to Q4 2010 and Q1 2011, Tellabs clearly did not take the steps necessary to improve its corporate governance in order to avoid a recurrence of the same issue.  As a result, on November 29, 2011, Tellabs disclosed that it was restating its fiscal Q2 and Q3 2011 financial results to correct improper recognition in Q2 2011 of $17.5 million that should have been recognized in Q3 2011.

11.     On December 5, 2011, the Individual Defendants caused Tellabs to file two restatements with the SEC.  The restatements removed $17.5 million of Tellabs' previously reported revenues for fiscal Q2 2011, and shifted that revenue to fiscal Q3 2011.

12.     In yet another demonstration of the deplorable condition of Tellabs' internal financial controls, more than seven months later, on July 27, 2012, the Individual Defendants caused Tellabs to file still another set of restatements of its fiscal Q2 and Q3 2011 financial results.  This time, the Company explained:

> The filing agent inadvertently used the XBRL interactive data file for Amendment No. 1 on Form 10-Q/A for the quarterly period ended September 30, 2011, instead of the XBRL interactive data file for Amendment No. 1 on Form 10-Q/A for the quarterly period ended July 1, 2011, when uploading the file.

13.     The Individual Defendants, Tellabs' directors and officers, were charged with approving, signing and certifying Tellabs' quarterly and annual financial reports that were filed with the SEC and contained the false financial results.  Moreover, certain defendants on Tellabs' Audit and Ethics Committee of the Board of Directors (the "Audit Committee") were responsible for reviewing and discussing the financial information included in the Company's earnings

- 4 -

announcements, and reviewing the effectiveness and adequacy of the Company's internal controls over financial reporting. The improper revenue recognition and resulting restatements were the result of the Individual Defendants' breaches of fiduciary duty.

14. In sum, as a result of the Individual Defendants' breaches of fiduciary duties, Tellabs disseminated at least four quarters worth of false financial results. The Individual Defendants' misconduct has damaged the Company and its shareholders. Tellabs has been named as a defendant in at least two class action securities fraud lawsuits. The Company has incurred, or is likely to incur, millions of dollars in fees and expenses to hire outside attorneys to defend the class action securities fraud lawsuits and address the Company's faulty internal controls. Additionally, the Company's goodwill and reputation have been materially undermined and tarnished. Finally, the Company paid too much for its own stock when the Individual Defendants caused it to repurchase its own shares at inflated prices.

15. Plaintiff brings this derivative action to: (a) recover damages against the Individual Defendants for the benefit of Tellabs; and (b) require Tellabs to reform and improve its corporate governance and internal procedures to protect the Company and its shareholders from a repeat of the damaging events described below.

16. The Tellabs Board of Directors ("Board") has not, and will not commence litigation against Defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Tellabs for making, authorizing, or failing to correct the false and misleading statements alleged herein. Certain of the Board members also face liability for insider trading and other wrongdoing. Accordingly, a pre-suit demand upon Tellabs' Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate Tellabs' rights against its wayward fiduciaries and hold them responsible for the damages they have caused Tellabs.

## II. JURISDICTION AND VENUE

17. This Court has jurisdiction in this case pursuant to 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds

$75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

20.     Plaintiff is a shareholder of Tellabs common stock and has continuously held the stock throughout the Relevant Period. Plaintiff is a citizen of Indiana.

21.     Defendant Tellabs is a Delaware corporation with its principal executive offices located at One Tellabs Center, 1415 W. Diehl Road, Naperville, Illinois 60563.

22.     Defendant Michael J. Birck ("Birck") is co-founder, Chairman of the Board, and a director of Tellabs. Birck has been a director of Tellabs since 1975, and Chairman of the Board since 2000. Upon information and belief, Birck is a citizen of Illinois.

23.     Defendant Bo Hedfors ("Hedfors") is a director of Tellabs, a position he has held since 2003. Upon information and belief, Hedfors is a citizen of California.

24.     Defendant Frank Ianna ("Ianna") is a director of Tellabs, a position he has held since 2004.  Ianna is, and at all relevant times was, a member of the Audit Committee.  Upon information and belief, Ianna is a citizen of Connecticut.

25.     Defendant Vincent D. Kelly ("Kelly") is a director of Tellabs, a position he has held since 2012.  Kelly is a member of the Audit Committee.  Upon information and belief, Kelly is a citizen of Virgina.

26.     Defendant Michael E. Lavin ("Lavin") is a director of Tellabs, a position he has held since 2003.  Lavin is, and at all relevant times was, a member and the Chair of the Audit Committee.  Upon information and belief, Lavin is a citizen of Illinois.

27.     Defendant Stephanie Pace Marshall ("Marshall") is a director of Tellabs, a position she has held since 1996.  Upon information and belief, Marshall is a citizen of Illinois.

28.     Defendant Gregory J. Rossman ("Rossman") is a director of Tellabs, a position he has held since 2012.  Rossman is a member of the Audit Committee.  Upon information and belief, Rossman is a citizen of California.

29.     Defendant Dennis F. Strigl ("Strigl") is a director of Tellabs, a position he has held since 2012.  Upon information and belief, Strigl is a citizen of New Jersey.

30.     Defendant Jan H. Suwinski ("Suwinski") is a director of Tellabs, a position he has held since 1997.  Suwinski is, and at all relevant times was, a member of the Audit Committee.  Upon information and belief, Suwinski is a citizen of New York.

31.     Defendant Vincent H. Tobkin ("Tobkin") is a director of Tellabs, a position he has held since 2010.  Upon information and belief, Tobkin is a citizen of California.

32.     Defendant Mikel H. Williams ("Williams") is a director of Tellabs, a position he has held since 2012.  Upon information and belief, Williams is a citizen of California.

33.     Defendant Linda W. Kahangi ("Kahangi") was a director of Tellabs, a position she has held from 2006 to 2012.  Upon information and belief, Kahangi is a citizen of Illinois.

34.     Defendant John Brots ("Brots") is Executive Vice President of Global Operations at Tellabs, a position he has held since 2005.  Upon information and belief, Brots is a citizen of Illinois.

35.      Defendant Roger J. Heinz ("Heinz") is Executive Vice President, Global Sales and Services at Tellabs, a position he has held since 2008.  Upon information and belief, Heinz is a citizen of Illinois.

36.     Defendant Jean K. Holley ("Holley") was, at all relevant times, Executive Vice President and Chief Information Officer at Tellabs.  Upon information and belief, Holley is a citizen of Illinois.

37.     Defendant Timothy J. Wiggins ("Wiggins") was, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Tellabs.  Upon information and belief, Wiggins is a citizen of Illinois.

38.     Defendant Thomas P. Minichiello ("Minichiello") was, at all relevant times, Vice President of Finance and Chief Accounting Officer of Tellabs.  Upon information and belief, Minichiello is a citizen of Illinois.

39.     Defendants Birck, Hedfors, Ianna, Kelly, Lavin, Marshall, Rossman, Strigl, Suwinski, Tobkin, and Williams are herein collectively referred to as the "Board" or the "Director Defendants."  Defendants Ianna, Kelly, Lavin, Rossman, and Suwinski are herein collectively referred to as the "Audit Committee Defendants."  Defendants Birck, Marshall, Kahangi, Brots, Heinz, Holley, and Wiggins are herein collectively referred to as the "Insider Selling Defendants."  The Director Defendants, the Audit Committee Defendants, and the Insider Selling Defendants are herein collectively referred to as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

40.     Tellabs designs, develops and supports telecommunications networking products. The Company generates revenue principally through the sale of these products to communications service providers worldwide as both stand-alone network elements and as

elements of integrated solutions, and also generates revenue by providing services to its customers.  At all relevant times, the Company operated in three business segments: (i) Broadband; (ii) Transport; and (iii) Services.

**B.     False and Misleading Statements**

41.     The Relevant Period begins on October 26, 2010.  On that day, the Company issued a press release entitled "Tellabs earnings per share double as revenue rises 10% year-over-year."  Therein, the Company, in relevant part, stated:

International revenue increases 14% year-over-year

Naperville, Ill. – Tellabs' third-quarter 2010 revenue totaled $429 million, up 10% from $389 million in the third quarter of 2009. International revenue was $132 million, up 14% from a year ago.

On a GAAP basis, Tellabs earned 15 cents per share in the third quarter of 2010, up from 7 cents per share in the year-ago quarter. Third-quarter 2010 GAAP net earnings were $57 million, compared with $29 million in the year-ago quarter.

On a non-GAAP basis, Tellabs earned 16 cents per basic share and 15 cents per diluted share in the third quarter of 2010, compared with 7 cents per share in the year-ago quarter. Non-GAAP net earnings were $59 million in the third quarter of 2010, compared with $28 million in the third quarter of 2009. Non-GAAP results for the third quarter of 2010 exclude pretax charges of $13.5 million, including $7.4 million or 1.3 cents per share in equity-based compensation expense.

Tellabs' GAAP gross profit margin was 50.2% in the third quarter of 2010, compared with 41.7% in the year-ago quarter. Tellabs generated $74.3 million in cash from operations during the quarter.

"Tellabs is generating profitable revenue by enabling customers to power the smart mobile Internet," said Rob Pullen, Tellabs president and chief executive officer. "It's early in the game for mobile Internet, and user demand for smartphones, tablets and mobile data is very strong."

For the third quarter of 2010, Broadband segment revenue was $199 million, down 3% from the year-ago quarter. Transport segment revenue was $170 million, up 33%. Services segment revenue was $60 million, up 9%.

**Share Repurchase** – Under previously announced share repurchase plans, during the third quarter of 2010 Tellabs repurchased approximately 15.6 million shares at a cost of $111 million. Over the past 5 years, Tellabs has repurchased more than

25% of its shares outstanding. Approximately $275 million currently remains under a previously authorized share repurchase program. Tellabs plans to continue returning capital to stockholders through dividends and share repurchases.

**Fourth-Quarter 2010 Guidance** – The following statements are forward-looking statements that are based on current expectations and involve risks and uncertainties, some of which are set forth below.

***Tellabs expects fourth-quarter revenue to be in the range of $410 million to $430 million, up from $389 million in the fourth quarter of 2009. Tellabs expects fourth-quarter gross margin to be 44%, plus or minus 1 or 2 points, depending on product mix. Tellabs expects fourth-quarter 2010 non-GAAP operating expenses to be in the mid-to-high $140 millions. Tellabs' expected fourth-quarter non-GAAP operating expenses exclude approximately $6 million in equity-based compensation expense. The fourth-quarter non-GAAP tax rate will be about 32%.***

42.     On October 26, 2010, the Company held a public conference call with investors, analysts and other market participants regarding its Q3 2010 financial results. Robert W. Pullen ("Pullen"), the Company's former president and CEO, and defendant Wiggins were present. Therein, Pullen and defendant Wiggins, in relevant part, reiterated the Company's Q4 2010 guidance:

[*Pullen*:] Now let's turn to the fourth quarter. As we've said earlier, international revenue is expected to increase in fourth quarter; North American revenue is forecast to be down. ***So in the fourth quarter, we expect revenue to be in the range of probably 410 to 430 million, which is up from 389 million in the fourth quarter of 2009.***

We expect fourth quarter gross margin to be 44%, plus or minus one or two points. It'll depend on product mix, but it's dominantly as a result of anticipated lower cross-connect sales.

We expect fourth quarter 2010 non-GAAP operating expenses to be in the mid to high $140 million as a result of higher R&D spending, dominantly in our growth products. This excludes approximately 6 million in equity-based compensation. And the fourth quarter non-GAAP tax rate's going to be around 32%.

\*          \*          \*

[*Defendant Wiggins*:] ***Turning to our outlook for the final quarter this year, based on orders in 3Q, backlog and given the overall market conditions, we are***

- 10 -

*guiding for fourth quarter revenue to be in a range between 410 million and 430 million. On a year-over-year basis, that equates to between 5 and 10% revenue growth.*

We expect gross margin in the fourth quarter to be 44% plus or minus a point or two. A lower level of revenue from digital cross-connect systems drives most of this anticipated change. A mix shift within data products and higher revenue from ONTs also contributes to the lower overall gross margin guidance.

We expect non-GAAP OpEx for the fourth quarter to be up in dollars and land in the mid- to high $140 million range as we continue to spend on R&D, particularly for growth products in combination with the anticipated spend on parts and prototypes. In addition, we expect the effect of expensing equity-based compensation in the fourth quarter will be about $6 million, split between operating expenses and cost of goods sold.

43. On November 9, 2010, Tellabs filed its Quarterly Report with the SEC on Form 10-Q for Q3 2010. The Company's Form 10-Q was signed by defendant Minichiello and reaffirmed the Company's financial results previously announced on October 26, 2010. Therein, the section entitled "Management's Discussion and Analysis of Results of Operations and Financial Condition," in relevant part, stated:

*Critical Accounting Policies*

There were no material changes in our critical accounting policies during the quarter.

*Outlook*

*We expect fourth-quarter revenue to be in the range of $410 million to $430 million, up from $389 million in the fourth quarter of 2009. We expect fourth-quarter gross margin to be 44%, plus or minus 1 or 2 points, depending on product mix. We expect fourth-quarter 2010 non-GAAP operating expenses to be in the mid-to-high $140 millions. The expected fourth-quarter non-GAAP operating expenses exclude approximately $6 million in equity-based compensation expense. The fourth-quarter non-GAAP tax rate will be about 32%.*

44. The statements contained in ¶¶41-43 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's Q4 2010 revenue guidance factored in a change to the distribution arrangement with

a certain customer which would accelerate revenue recognition on substantial sales to Q4 2010 that otherwise would not have been recognized until Q1 2011; (2) that, as such, this out of the ordinary shift in revenue recognition from Q1 2011 masked that the Company's business and revenues were declining substantially faster in Q4 2010 than the Company had represented to the public; (3) that the Company's North American business was slowing at a greater rate than the Company had represented to the public; and (4) that, as a result of the above, the defendants' positive statements and outlook for Q4 2010 lacked a reasonable basis and/or were materially false and/or misleading when made.

### C. The Individual Defendants Cause the Company to File Another Materially False and Misleading Earnings Statement

45. On January 25, 2011, Tellabs issued a press release entitled "Tellabs fourth-quarter revenue rises 5% to $410 million." The Company reported that it had hit the low end of its previously issued Q4 2010 revenue guidance and provided guidance for Q1 2011 that reflected a substantial further revenue slowdown. Therein, the Company, in relevant part, stated:

Company posts fourth-quarter GAAP net loss of $11 million or 3 cents per share

Naperville, Ill. – ***Tellabs' fourth-quarter 2010 revenue totaled $410 million, up 5% from $389 million in the fourth quarter of 2009.***

On a GAAP basis, Tellabs recorded a net loss of $11 million or 3 cents per share in the fourth quarter of 2010, compared with net earnings of $62 million or 16 cents per share in the fourth quarter of 2009. The fourth-quarter 2010 net loss included a pretax charge of $16.5 million for excess purchase commitments related to a cancelled tender in India.

On a non-GAAP basis, Tellabs earned 2 cents per share in the fourth quarter of 2010, compared with 9 cents in the year-ago quarter. Non-GAAP net earnings were $6 million in the fourth quarter of 2010, compared with $36 million in the year-ago quarter. Non-GAAP results exclude $6.3 million or 1.2 cents per share in equity-based compensation expense.

**2010 Annual Results** – Tellabs 2010 revenue was $1.64 billion, up 8% from $1.53 billion in 2009. On a GAAP basis, in 2010 Tellabs earned $156 million or 41 cents per share, up from $114 million or 29 cents per share in 2009. Tellabs' 2010 non-GAAP net earnings were $176 million and 46 cents per share, compared with $119 million or 30 cents per share in 2009.

Tellabs' GAAP gross profit margin was 38.0% in the fourth quarter of 2010 (42.0% excluding the charge for excess purchase commitments), compared with 45.3% in the fourth quarter of 2009. Tellabs generated $53.1 million in cash from operations during the quarter.

"Tellabs' fourth quarter brought revenue growth but a setback in profitability," said Rob Pullen, Tellabs president and chief executive officer. "Looking ahead, customers continue to validate Tellabs' focus on the smart mobile Internet, and we remain focused on investing our way forward to pursue this growth opportunity."

For the fourth quarter of 2010, Broadband segment revenue was $227 million, Transport segment revenue was $123 million and Services segment revenue was $60 million. For 2010, Broadband segment revenue was $846 million, Transport segment revenue was $554 million and Services segment revenue was $242 million.

**Share Repurchase** — Under previously announced share repurchase plans, during the fourth quarter of 2010 Tellabs repurchased 7.6 million shares at a cost of $50.9 million. For the full year 2010 Tellabs repurchased 25.1 million shares at a cost of $178.8 million.

**Adoption of new accounting pronouncements** — In the fourth quarter, Tellabs early-adopted two required accounting standards related to revenue recognition, Accounting Standards Update ("ASU") No. 2009-13 and ASU No. 2009-14 for transactions originating or materially modified in 2010. These new standards generally result in earlier revenue recognition than under previous standards for certain deliverables in multiple-element arrangements. Tellabs adopted the new standards effective as of the beginning of 2010; therefore, the previously reported quarterly results have been revised to reflect the impact of adoption. The adoption increased Tellabs fourth-quarter 2010 revenue by $8.8 million and annual revenue by $9.1 million.

**First-Quarter 2011 Guidance** — The following statements are forward-looking statements that are based on current expectations and involve risks and uncertainties, some of which are set forth below. ***We expect first-quarter 2011 revenue to be in a range from $315 million to $335 million.*** We expect non-GAAP gross margin to be 40%, plus or minus two points, depending on product mix. We expect first-quarter non-GAAP operating expense to be down slightly, in the high $140 millions. Tellabs' first-quarter non-GAAP gross margin excludes approximately $1 million, and non-GAAP operating expense excludes approximately $6 million, in equity-based compensation expense. We expect a first-quarter non-GAAP tax rate of about 32%.

Tellabs believes that the presentation of non-GAAP financial information provides important supplemental information to management and investors regarding financial and business trends relating to the company's financial results.

More detailed information, including year-over-year segment comparisons, non-GAAP reconciliation tables and the reasons management believes non-GAAP measures provide useful information to investors can be found in the Results of Operations section of this news release.

46.     On January 25, 2011, the Company held a public conference call with investors, analysts and other market participants, regarding its Q4 2010 financial results.   Pullen and defendant Wiggins were present.   Therein, Pullen, in relevant part, admitted that the reported Q4 2010 revenue had actually benefitted from the manner in which it sold products to a customer:

[*Pullen*:] We early adopted two required revenue recognition rules to better reflect the economics of our multi-year deals that we had already entered into. And that increased our revenue about $9 million.

***Our fourth quarter revenue also reflected our agreement with a North American customer to add our data product to other products already sold to this customer through a distributor. This change increased our revenue by about $21 million.***

47.     Additionally, during the Q4 2010 conference call, Pullen commented on the anticipated revenue decline reflected by the Company's revenue guidance for Q1 2011:

[*Pullen*:] ***Looking to our guidance for the first quarter, we expect revenue to be in the range of $315 to $335 million.*** We expect non-GAAP gross margin to be 40% plus or minus two points – again, depending on product mix. We expect non-GAAP operating expenses to be slightly down, probably in the high $140 millions.

***Obviously, we're disappointed in our fourth quarter results and our guidance for the first quarter. After three quarters of strong performance in 2010, we certainly didn't want to end the year this way.*** During the first three quarters of last year, our revenue and profits were driven by growth in digital cross-connects and our data products, predominantly from mobile backhaul and primarily in North America.

In the fourth quarter, our digital cross-connect and data revenue in North America declined.  ***As a result, our revenue declined sequentially in fourth quarter, and will decline again in the first quarter. That's the outlook as we see it today, and we're certainly going to work hard to improve it***.

- 14 -

*Despite lower revenue in North America, our fourth quarter data revenue grew both sequentially and on a year-over-year basis.* We won 21 new customers for our data products, and generated higher revenue from our SmartCore platform. That was all a positive sign in the fourth quarter.

48. During the Q4 2010 conference call, defendant Wiggins further commented on the change in the distribution arrangement with one of the Company's customers and specifically explained that this change had resulted in Tellabs recognizing $20.8 million in revenue in Q4 2010 that otherwise would have been recognized in Q1 2011:

[*Defendant Wiggins*:] Good morning, everyone. To begin, I'll give a little more background on some of the items affecting this quarter's results. We had two items that positively affected our results in the fourth quarter and one with a negative effect. All these are described in the MD&A section of this morning's press release. But let me tell you about them now.

First, during the quarter, we adopted ASU 2009-13, and ASU 2009-14, the new revenue recognition standards for multi-deliverable contracts, and contracts with software elements. Although we had planned to adopt these standards in the first quarter of 2011, we did it last year because we were entering in to several large multi-year contracts, and we believe the new rules would best reflect the economics of those deals over time.

As a result, revenue and net earnings in the fourth quarter of 2010 increased by 8.8 million and 0.5 million, respectively. For the year 2010, revenue and net earnings increased by 9.1 million and 0.5 million, respectively. We adopted these standards as of the beginning of 2010, and our previously reported quarterly results have been revised to reflect the impact of the adoption.

*Second, revenue in the quarter also reflected our agreement with a North American customer to add a data product to other Tellabs' products already sold to that customer through a distributor. This way of doing business helps the customer better manage inventory and deployment schedules. As a result, we recognized $20.8 million in revenue in the fourth quarter of 2010 that otherwise would have been recognized in the first quarter of 2011.*

And now for the third item, during the quarter we took a pre-tax charge of $16.5 million, that's $12.2 million net of tax, for excess purchase commitments related to a number of Tellabs-specific components we ordered last year for a large project in India. The tender was canceled in January, and we are writing down the parts we estimate to be in excess of our needs.

Let's take a look at the fourth quarter numbers. After that I'll review our guidance for the first quarter of 2011. Total revenue for the fourth quarter of 2010 was $410

- 15 -

million, compared with $430 million in the prior quarter and at the low end of the guidance range we gave you in October.

On a year-over-year basis, total revenue for the quarter was up 5%, compared with the fourth quarter of last year. On a sequential basis, broadband segment revenue grew, the service segment was essentially flat, and transport segment revenue declined.

49.     During the Q4 2010 conference call, defendant Wiggins specifically admitted that the fact that Tellabs was changing its distribution arrangement with this customer – which resulted in an out of the ordinary $20.8 million beneficial increase to Q4 2010 revenue that otherwise would have been recognized in Q1 2011 – had been known at the time defendants provided the Q4 2010 guidance in October 2010 and was factored into the Q4 2010 guidance:

> [*Analyst*:]  Okay. So I guess when I look at the first-quarter guidance, you had – even though the business was up a little bit here, the – that $20 million revenue recognition looked like it should have been in the first quarter of next year.  So is that the big delta that we're looking at in that first quarter guide in addition to cross-connects being soft?  Is that the perspective on that?
>
> And can you provide a little bit more insight as to what surprised you here in terms of what this customer decided to do?
>
> [*Defendant Wiggins:*]  One, we did not anticipate – ***I'm sorry, when we set the guidance and provided it to you in October, we did anticipate the change in this distribution arrangement with the customer.***  We did not anticipate, as we mentioned, changing the revenue recognition standards, but we did have a couple of very large contracts that we wanted to sign in 4Q, and we felt that the accounting under the new rules better reflected the economics.

50.     Pullen and defendant Wiggins again admitted during the Q4 2010 conference call that the beneficial change in the timing of revenue recognition on the sales of products to this customer had been known when the Company provided Q4 2010 guidance and had been factored into the Q4 2010 guidance:

> [*Analyst*:]  Thanks. Just to clarify for me, you talked about this $21 million in revenues; it sounds like the recognition was pulled forward.  But then the press release notes a $9 million difference in the quarter. What's the total impact from accounting change [and] other that impacted 4Q revenue positively?

[*Defendant Wiggins*:] Okay. Well, there are a couple of items, Michael. One is that we adopted the new revenue recognition standards, which we did not contemplate when we gave you guidance. That was $8.8 million, or call it $9 million, in 4Q. It had very little impact in periods one, two and three. As you can see, the difference between the $8.8 million and the $9.1 million. So, revenue recognition was the first thing.

**The second thing was we had a change in how we sell to a customer in North America for a product. It's now included with other products that had been previously sold through the distributor. The net result was that those orders for us occurred in 4Q, otherwise would have been in Q1. That was about $21 million. The sum of the two together at about $30 million.**

[*Pullen*:] **And . . . as for the distributor, we had contemplated that when we gave you guidance, Michael.**

**And as Tim mentioned, we had already been doing business with this distributor to the end customer. And the distributor helps the end customer both manage inventory, deployment schedules, and gives them content and minority women business enterprise and disabled veterans enterprise, which curries favor for government contracts. So, we had already been doing business with this distributor before today.**

51. Additionally, during the Q4 2010 conference call, defendant Wiggins effectively admitted that when evaluating the Company's Q4 2010 financial results, Tellabs' reported revenues would have been substantially below the previously issued guidance if adjusted to remove the unusual $20.8 million benefit from the acceleration of revenue recognition to Q4 2010 as a result of the change in the distribution arrangement with the customer:

[*Analyst*:] . . . First of all, if we were to take the $30 million of accounting changes in Q4, and put them back into Q1, then this quarter would have been $380 million instead of $410 million, and the walkdown into Q1, I assume would that be $30 million higher. So taking the midpoint, maybe you would be on $355 million.

So it looks like your normal seasonality into Q1 from this lower Q4 sort of makes sense when viewed in the old accounting construct. I want to make sure that's correct.

And then – but then we have the issue of doing a $380 million when you had been guiding to – let's take the midpoint of your guidance of $420 million. Tim, can you just walk us down? Was that all 5500 related the $40 million missing

between the $420 million you had sort of expected, and the $380 million under the prior accounting?

[*Defendant Wiggins*:] . . . ***[I]nteresting math, but let me touch on a couple things. One is, as Rob pointed out, the change in this distribution agreement was something we contemplated when we gave the guidance, albeit, you know, we came in at the low end of the $410 million range***. The revenue recognition standards was something we did not anticipate.

By the way, that revenue wouldn't simply flop into Q1. Had we signed these agreements under the old rules, we would have been forced to account for these projects under the old rules, and it would have been amortized over the life of the contract. So, that was a pretty easy decision.

So, certainly it's right. I think your analysis is directionally correct on moving the distribution agreement revenue from 4Q to 1Q. ***I think the revenue recognition is probably not the right way to think about it. So, hopefully, that's a little bit helpful*** . . . .

52.     On this news, shares of Tellabs declined $1.35 per share, or almost 20%, to close on January 25, 2011, at $5.69 per share, on unusually heavy volume.

53.     On March 1, 2011, Tellabs filed its Annual Report with the SEC on Form 10-K for the 2010 fiscal year. Therein, the section entitled "Management's Discussion and Analysis," in relevant part, stated:

**Results of Operations**

Net earnings for the year 2010 grew to $155.6 million, compared with net earnings of $113.6 million in 2009. In 2008, net loss was $930.1 million when the company recorded a non-cash goodwill impairment charge of $988.3 million.

In 2010, revenue was $1,642.3 million, compared with $1,525.7 million in 2009 and $1,729.0 million in 2008. For the year 2010, revenue increased in all three segments.

In the fourth quarter of 2010, we early adopted two new required accounting standards related to revenue recognition: Accounting Standards Update (ASU) 2009-13, *Multiple-Deliverable Revenue Arrangements*, and ASU 2009-14, *Certain Revenue Arrangements That Include Software Elements*. These new standards generally result in earlier revenue recognition than under previous standards for certain deliverables in multiple-element arrangements. We adopted these standards effective as of the beginning of 2010. For the year 2010, revenue and net earnings increased by $9.1 million and $0.5 million, respectively. We

adopted these standards in the fourth quarter of 2010 on a prospective basis for new and materially modified arrangements originating in fiscal 2010. We believe the new rules best reflect the economics of those agreements over time.

***In the fourth quarter of 2010, we agreed with a North American customer to add a data product to other Tellabs products already sold to that customer through a distributor. This helps the customer better manage inventory and deployment schedules. As a result, we recognized $20.8 million in revenue in the fourth quarter of 2010 that otherwise would have been recognized in the first quarter of 2011.***

54.     The statements contained in ¶¶45-53 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's North American business was slowing at a greater rate than the Company had represented to the public; and (2) that, as a result of the above, the defendants' positive statements about the Company's business, operations and prospects lacked a reasonable basis and/or were materially false and/or misleading when made.

### D.     The Truth Begins to Emerge

55.     On April 26, 2011, the Company issued a press release entitled "Tellabs first-quarter revenue totals $322 million." Therein, the Company, in relevant part, stated:

Naperville, Ill. - Tellabs' first-quarter 2011 revenue totaled $322 million, down 15% from $379 million in the first quarter of 2010.

On a GAAP basis, Tellabs recorded a net loss of $24 million or 7 cents per share in the first quarter of 2011, compared with net earnings of $46 million or 12 cents per share in the first quarter of 2010.

In the first quarter of 2011, Tellabs had a non-GAAP net loss of 3 cents per share, compared with net earnings of 11 cents per share in the year-ago quarter. Non-GAAP net loss was $11 million in the first quarter of 2011, compared with net earnings of $44 million in the year-ago quarter. Non-GAAP results exclude $7.7 million pretax or 1.4 cents after-tax per share in equity-based compensation expense.

To pursue the long-term growth opportunity of the mobile Internet, Tellabs increased its research and development (R&D) investment by 16% year over year to $80 million, or 25% of first-quarter revenue.

"While international revenue grew 40% from a year ago, lower revenue in North America drove Tellabs' first-quarter results," said Rob Pullen, Tellabs president and chief executive officer. "Going forward, we will continue to invest in the smart mobile Internet through increased R&D spending to position Tellabs for long-term growth."

For the first quarter of 2011, Broadband segment revenue was $173 million, Transport segment revenue was $99 million and Services segment revenue was $50 million.

**Second-Quarter 2011 Guidance** — The following statements are forward-looking statements that are based on current expectations and involve risks and uncertainties, some of which are set forth below. We expect second-quarter 2011 revenue to be up in a range from $325 million to $345 million. We expect non-GAAP gross margin to be flat with 1Q11, plus or minus one or two points, depending on product and customer mix. We expect second-quarter non-GAAP operating expense to be down slightly in the low $140 millions.

56.     On this news, shares of Tellabs declined $0.49 per share, 9.09%, to close on April 26, 2011, at $4.90 per share, on heavy trading volume.

### E.     The Individual Defendants Cause the Company to File Two More Materially False and Misleading Earnings Statements

57.     On July 26, 2011, the Company issued a press release entitled "Tellabs reports second-quarter total of $322 million."  Therein, the Company, in relevant part, stated:

Naperville, Ill. - Tellabs' second-quarter 2011 revenue totaled $334 million, down 21% from $423 million in the year-ago quarter. North America revenue fell 46%, while international revenue rose 70%, compared with the year-ago quarter.

On a GAAP basis, Tellabs recorded a net loss of $20 million or 6 cents per share (basic and diluted) in the second quarter of 2011, compared with net earnings of $64 million or 17 cents per basic share and 16 cents per diluted share in the second quarter of 2010.

On a non-GAAP basis, Tellabs had a net loss of 2 cents per share (basic and diluted) in the second quarter of 2011, compared with net earnings of 17 cents per share (basic and diluted) in the year-ago quarter. Non-GAAP net loss was $7 million in the second quarter of 2011, compared with net earnings of $67 million in the second quarter of 2010. Non-GAAP results for the second quarter of 2011 exclude pretax charges of $13 million, which include $8 million or 1.5 cents per share in equity-based compensation expense.

Tellabs' GAAP gross profit margin was 37.4% in the second quarter of 2011, compared with 53.5% in the year-ago quarter. The company generated $28 million in cash from operations during the second quarter.

"While we're never satisfied with a loss, we're making progress in improving Tellabs' performance. In the second quarter, international revenue grew 70% year-over-year, growth products generated a record 61% of revenue, and the Tellabs 7100 system had its best quarter ever. Compared with the first quarter, we reduced operating expenses and improved cash flow from operations," said Rob Pullen, Tellabs president and chief executive officer. "Going forward, we will cut $50 million from expenses and costs over the next year, better aligning our expenses with revenue expectations. The restructuring unfortunately will affect about 330 or 10% of our employees. We are investing aggressively in research and development, devoting one-fourth of our revenue to growth products, as we focus on next-generation platforms to help customers succeed in the mobile Internet."

For the second quarter of 2011, Broadband segment revenue was $163 million, down 29% from the year ago quarter. Transport segment revenue was $114 million, down 14%. Services segment revenue was $57 million, down 6%.

**Third-Quarter 2011 Guidance** — The following statements are forward-looking statements that are based on current expectations and involve risks and uncertainties, some of which are set forth below. Although Tellabs' 3Q revenue can be seasonally down, we expect third-quarter 2011 revenue to be flat, in a range from $325 million to $345 million. We expect third-quarter non-GAAP gross margin to be 39%, plus or minus a point or two, depending on mix. We expect third-quarter non-GAAP operating expense to be down again to the mid-$130 millions. Tellabs' third-quarter non-GAAP gross margin excludes approximately $1 million, and non-GAAP operating expense excludes approximately $6 million, in equity based compensation expense. We expect a third-quarter non-GAAP tax rate of about 32%.

58.    On August 10, 2011, the Individual Defendants caused Tellabs to file its quarterly report with the SEC on Form 10-Q for the 2011 fiscal second quarter. The Company's Form 10-Q was signed by defendant Minichiello and reaffirmed the Company's financial results previously announced on July 26, 2011. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Pullen and defendant Wiggins, who certified as follows:

1.    I have reviewed this Quarterly Report on Form 10-Q of Tellabs, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

59.     On October 25, 2011, the Company issued a press release entitled "Tellabs reports third-quarter revenue of $314 million." Therein, the Company, in relevant part, stated:

Naperville, Ill. - Tellabs' third-quarter 2011 revenue totaled $314 million, compared with $430 million in the year-ago quarter. North American revenue declined to $151 million, and revenue outside North America rose to $163 million.

"We're disappointed by third-quarter revenue in North America," said Rob Pullen, Tellabs president and chief executive officer. "Yet we're encouraged by the continuing growth of our business outside North America, which generated more than half of Tellabs' quarterly revenue for the first time."

On a GAAP basis, Tellabs recorded a net loss of $138 million or 38 cents per share in the third quarter of 2011, compared with net earnings of $57 million or 15 cents per share in the third quarter of 2010. The loss was primarily driven by:

• a non-cash goodwill impairment charge of $83 million

• a non-cash in-process R&D impairment charge of $20 million

• previously announced restructuring charges of $20 million.

On a non-GAAP basis, Tellabs had a net loss of 1 cent per share (basic and diluted) in the third quarter of 2011, compared with net earnings of 16 cents per basic and 15 cents per diluted share in the year-ago quarter. Non-GAAP net loss was $3 million in the third quarter of 2011, compared with net earnings of $59 million in the third quarter of 2010. Non-GAAP results for the third quarter of 2011 exclude pretax charges of $134 million, including $6.3 million or 1.2 cents per share in equity-based compensation expense.

Tellabs' GAAP gross profit margin was 40.8% in the third quarter of 2011, compared with 50.2% in the year-ago quarter.

"Looking forward, we're focusing on a next-generation product portfolio to fulfill our mobile Internet strategy," Pullen added. "We recently recognized our first revenue from the new Tellabs 8609, a low-cost, high-density Ethernet mobile backhaul platform. And we announced the new Tellabs SmartCore® 9200

- 23 -

platform, which will help our customers succeed by making networks smarter, improving the user experience and generating new revenue streams."

For the third quarter of 2011, Broadband segment revenue was $170 million, down 15% from the year ago quarter. Transport segment revenue was $87 million, down 49%. Services segment revenue was $57 million, down 6%.

**Fourth-Quarter 2011 Guidance** - The following statements are forward-looking statements that are based on current expectations and involve risks and uncertainties, some of which are set forth below. We are targeting fourth-quarter 2011 revenue to be flat to slightly up, but given our lower visibility into customers' spending, we are guiding to a broader range from $300 million to $330 million. We expect fourth-quarter non-GAAP gross margin to be flat, plus or minus a point or two, depending on mix. We expect fourth-quarter non-GAAP operating expense to be down again in the mid-$130 millions. Tellabs' fourth-quarter non-GAAP gross margin excludes approximately $1 million, and non-GAAP operating expense excludes approximately $5 million in equity-based compensation expense. We expect a fourth-quarter non-GAAP tax rate of about 32%.

60.     On November 8, 2011, the Individual Defendants caused Tellabs to file its quarterly report with the SEC on Form 10-Q for the 2011 fiscal third quarter.  The Company's Form 10-Q was signed by defendant Minichiello and reaffirmed the Company's financial results previously announced on July 26, 2011.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Pullen and defendant Wiggins, substantially similar to the certifications contained in ¶58, *supra*.

### F.     The Individual Defendants Cause the Company to File Two Restatements to Correct Materially False and Misleading Earnings Statements

61.     On November 29, 2011, the Individual Defendants caused Tellabs to file a Current Report with the SEC on Form 8-K, which stated in part:

On November 28, 2011, Tellabs, Inc. (Tellabs) determined that $17.5 million of revenue recognized in the quarter ended July 1, 2011, should have instead been recognized in the quarter ended September 30, 2011, as more fully described below. As a result, we have concluded that the previously issued interim financial statements included in our Forms 10-Q as of and for the quarters ended July 1, 2011, and September 30, 201l, should no longer be relied upon. We will restate our interim consolidated financial statements for the second and third quarters of 2011 through the filing of amendments to our previously filed Forms 10-Q.

- 24 -

> In the second quarter of 2011, we had recognized $15.3 million of revenue related to a project with a customer outside North America. The related products were accepted by the customer and title passed to the customer in the second quarter. However, we recently discovered that these products had been shipped to a temporary, third-party storage location, arranged by our local office to accommodate delivery. While $2.6 million of these products were delivered from the third-party warehouse to the customer by the end of the second quarter, the balance of these products were not delivered from the third-party warehouse to the customer until July 20, 2011. Consequently, we have concluded that revenue for the undelivered products as of the end of the second quarter should have been recognized in the third quarter.

62.     On December 5, 2011, the Individual Defendants caused Tellabs to file two Forms 10-Q/A, restating the consolidated financial statements and other financial information previously provided for the 2011 fiscal second and third quarters. The Company's Forms 10-Q/A were signed by defendant Minichiello and reflected the revenue recognition problem identified in Tellabs' SEC Form 8-K filed on November 29, 2011. The Company's Forms 10-Q/A also contained Sarbanes-Oxley required certifications, signed by Pullen and defendant Wiggins, substantially similar to the certifications contained in ¶58, *supra*.

### G.     The Individual Defendants Cause the Company to File Two Further Restatements to Correct Materially False and Misleading Earnings Statements

63.     On July 27, 2012, Individual Defendants caused Tellabs to file two additional Forms 10-Q/A, again restating the consolidated financial statements and other financial information previously provided for the 2011 fiscal second and third quarters. The Company's Forms 10-Q/A were signed by defendant Minichiello and also contained Sarbanes-Oxley required certifications, signed by acting CEO Daniel P. Kelly and Chief Financial Officer Andrew B. Szafran, substantially similar to the certifications contained in ¶58, *supra*. The explanatory note accompanying this second set of restatements stated, in relevant part:

> The filing agent inadvertently used the XBRL interactive data file for Amendment No. 1 on Form 10-Q/A for the quarterly period ended September 30, 2011, instead of the XBRL interactive data file for Amendment No. 1 on Form 10-Q/A for the quarterly period ended July 1, 2011, when uploading the file.

64.     The SEC has reiterated its position regarding restatements:

[T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter* . . . .

*In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report at 2 (S.D. Fla. Feb. 22, 2002).

65.     The fact that Tellabs was forced to restate its financial statements is an admission that the financial statements originally issued were false and that the overstatement of its income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Tellabs was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  Moreover, FASB Statement of Financial Accounting Standard ("SFAS") No. 154, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements."  SFAS No. 154, ¶25.  Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements.  Tellabs' restatements were due to errors with respect to accounting for revenues.  Thus, the restatements are admissions by Tellabs that its previously issued financial results and its public statements regarding those results were false.

66.     The confusing and highly irregular action of issuing two sets of restatements for two fiscal quarters did not go unnoticed by analysts or the markets.  As one analyst put it in a July 31, 2012 report on Tellabs' troubling corporate governance issues:

As the explanatory note must be read in conjunction with other filings, it is unclear and does not add to the company's credibility. . . In the meantime Tellabs' stock price has dropped by more than 18% in the year to date and traded

at $3.31 per share intraday on Tuesday [July 31, 2012]. As long as investors continue to scratch their heads, the stock price seems unlikely to recover.

67.     Indeed, the stock price has not recovered.  Since July 27, 2012, the date of Tellabs' second set of restatements of consolidated financial statements and other financial information previously provided for the 2011 fiscal second and third quarters, the stock price has not traded higher than the peak of $3.78 it reached on September 14, 2012.  On March 4, 2013, Tellabs stock closed at $2.00.

### H.     Insider Trading Allegations

68.     At the same time that the Individual Defendants were causing Tellabs to publish materially false and misleading financial statements, and before announcing significant revisions to these statements, Defendants Birck, Marshall, Kahangi, Brots, Heinz, Holley and Wiggins dumped millions of dollars worth of personally held Tellabs common stock at artificially inflated prices.  In total, during the Relevant Period, the Insider Trading Defendants unloaded 405,228 shares of personally held Tellabs common stock, at an average price per share of $6.31, for total proceeds of $2,555,200.

### 1.     **Defendant Birck**

69.     Defendant Birck, as Chairman of the Company, was privy to material non-public information about the Company's improper recognition of revenues.  Defendant Birck knew that the statements that the Individual Defendants caused the Company to make regarding its revenue recognition were false and misleading when made.  He also knew that the misstatements would create an inflated stock price.  Defendant Birck took advantage of this undisclosed information to sell his personally-held stock for considerably more than the stock was worth.

70.     On January 6, 2011, while in possession of undisclosed material adverse information, defendant Birck sold 200,000 shares of his personally held Tellabs stock at $7.00 per share for $1,400,000 in proceeds.  Defendant Birck's sale was timed to maximize profit from the Company's artificially inflated stock price.  After the corrective disclosure regarding the Q4

2010 improper recognition of revenue, the Company's stock price declined to less than $5.00 per share.

### 2. Defendant Marshall

71.     Defendant Marshall, as a director of the Company, was privy to material non-public information about the Company's improper recognition of revenues.  Defendant Marshall knew that the statements that the Individual Defendants caused the Company to make regarding its revenue recognition were false and misleading when made.   She also knew that the misstatements would create an inflated stock price.  Defendant Marshall took advantage of this undisclosed information to sell her personally-held stock for considerably more than the stock was worth.

72.     On May 19, 2011, while in possession of undisclosed materially adverse information, defendant Marshall sold 15,450 shares of her personally held Tellabs stock at $4.67 per share for $72,152 in proceeds.  Defendant Marshall's sale was timed to maximize profit from the Company's artificially inflated stock price.

### 3. Defendant Kahangi

73.     Defendant Kahangi, as a director of the Company, was privy to material non-public information about the Company's improper recognition of revenues.  Defendant Kahangi knew that the statements that the Individual Defendants caused the Company to make regarding its revenue recognition were false and misleading when made.   She also knew that the misstatements would create an inflated stock price.  Defendant Kahangi took advantage of this undisclosed information to sell her personally-held stock for considerably more than the stock was worth.

74.     On November 29, 2010, while in possession of undisclosed material adverse information, defendant Kahangi sold 21,121 of her personally held Tellabs stock at $6.34 per share for $133,793 in proceeds.  Defendant Kahangi's sale was timed to maximize profit from the Company's artificially inflated stock price.  After the corrective disclosure regarding the Q4

2010 improper recognition of revenue, the Company's stock price declined to less than $5.00 per share.

### 4. **Defendant Brots**

75.     Defendant Brots, as Executive Vice President, Global Operations, of the Company, was privy to material non-public information about the Company's improper recognition of revenues.  Defendant Brots knew that the statements that the Individual Defendants caused the Company to make regarding its revenue recognition were false and misleading when made.  He also knew that the misstatements would create an inflated stock price.  Defendant Brots took advantage of this undisclosed information to sell his personally-held stock for considerably more than the stock was worth.

76.     On July 1, 2011, while in possession of undisclosed material adverse information, defendant Brots sold 7,853 shares of his personally held Tellabs stock at $4.61 per share for $36,202 in proceeds.  Defendant Brots's sale was timed to maximize profit from the Company's artificially inflated stock price.

### 5. **Defendant Heinz**

77.     Defendant Heinz, as Executive Vice President, Global Sales and Services, of the Company, was privy to material non-public information about the Company's improper recognition of revenues.  Defendant Heinz knew that the statements that the Individual Defendants caused the Company to make regarding its revenue recognition were false and misleading when made.  He also knew that the misstatements would create an inflated stock price.  Defendant Heinz took advantage of this undisclosed information to sell his personally-held stock for considerably more than the stock was worth.

78.     On January 6, 2011, while in possession of undisclosed material adverse information, defendant Heinz sold 50,000 shares of his personally held Tellabs stock at $7.00 per share for $350,000 in proceeds.  Defendant Heinz's sale was timed to maximize profit from the Company's artificially inflated stock price.  After the corrective disclosure regarding the Q4

2010 improper recognition of revenue, the Company's stock price declined to less than $5.00 per share.

### 6. **Defendant Holley**

79. Defendant Holley, as a director of the Company, was privy to material non-public information about the Company's improper recognition of revenues. Defendant Holley knew that the statements that the Individual Defendants caused the Company to make regarding its revenue recognition were false and misleading when made. She also knew that the misstatements would create an inflated stock price. Defendant Holley took advantage of this undisclosed information to sell her personally-held stock for considerably more than the stock was worth.

80. On January 21, 2011, while in possession of undisclosed material adverse information, defendant Holley sold 9,924 shares of her personally held Tellabs stock at $6.91 per share for $68,596 in proceeds. Defendant Holley's sale was timed to maximize profit from the Company's artificially inflated stock price. After the corrective disclosure regarding the Q4 2010 improper recognition of revenue, the Company's stock price declined to less than $5.00 per share.

81. On July 1, 2011, while in possession of undisclosed material adverse information, defendant Holley sold 50,000 more shares of her personally held Tellabs stock at $4.63 per share for $231,645 in proceeds. Defendant Holley's sale was timed to maximize profit from the Company's artificially inflated stock price.

82. In sum, defendant Holley unloaded a total of 59,924 shares of personally held Tellabs stock for total proceeds of $300,241.

### 7. **Defendant Wiggins**

83. Defendant Wiggins, as Executive Vice President and CFO of the Company, was probably more intimately familiar with the financial health of the Company than any other employee at Tellabs. Defendant Wiggins knew that the statements that the Individual Defendants caused the Company to make regarding its revenue recognition were false and

misleading when made. He also knew that the misstatements would create an inflated stock price. Defendant Wiggins took advantage of this undisclosed information to sell his personally-held stock for considerably more than the stock was worth.

84. On November 1, 2010, while in possession of undisclosed material adverse information, defendant Wiggins sold 3,528 shares of his personally held Tellabs stock at $6.91 per share for $24,378 in proceeds. Defendant Wiggins's sale was timed to maximize profit from the Company's artificially inflated stock price. After the corrective disclosure regarding the Q4 2010 improper recognition of revenue, the Company's stock price declined to less than $5.00 per share.

85. On March 9, 2011, while in possession of undisclosed material adverse information, defendant Wiggins sold 31,333 more shares of his personally held Tellabs stock at $5.21 per share for $163,137 in proceeds. Defendant Wiggins's sale was timed to maximize profit from the Company's artificially inflated stock price. After the corrective disclosure regarding the Q4 2010 improper recognition of revenue, the Company's stock price declined to less than $5.00 per share.

86. Finally, on May 6, 2011, while in possession of undisclosed material adverse information, defendant Wiggins sold 16,019 more shares of his personally held Tellabs stock at $4.70 per share for $75,297 in proceeds. Defendant Wiggins's sale was timed to maximize profit from the Company's artificially inflated stock price.

87. In sum, defendant Wiggins unloaded a total of 50,880 shares of personally held Tellabs stock for total proceeds of $262,812.

88. Tellabs' stock price was artificially inflated as a result of, among other things, defendant Wiggins's improper statements. Specifically, defendant Wiggins made improper statements regarding revenue that was improperly recognized in Q4 2010 rather than Q1 2011. In addition, defendant Wiggins made improper statements regarding revenue that was improperly recognized in Q2 2011 rather than Q3 2011.

## V.      DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.      Fiduciary Duties

89.      By reason of their positions as officers, directors, and/or fiduciaries of Tellabs and because of their ability to control the business and corporate affairs of Tellabs, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tellabs in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Tellabs and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

90.      Each director and officer of the Company owes to Tellabs and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### B.      Audit Committee Duties

91.      In addition to these duties, the members of the Audit Committee owed specific duties to Tellabs under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.   In particular, the Audit Committee's Charter provided as follows:

### I.  PURPOSE

The primary function of the Audit and Ethics Committee ("Committee") is to assist the Board of Directors in fulfilling its oversight corporate responsibilities. Consistent with this function, the Committee will encourage continuous improvement of, and will foster adherence to, the Company's policies, procedures

and practices at all levels. The Committee's primary duties and responsibilities are:

● To serve as an independent and objective party to monitor the Company's financial reporting process and internal control system;

● To appoint, compensate, retain and oversee the work of the Company's independent auditor;

● To oversee the work of the internal audit function and to provide it with organizational independence by providing it a direct reporting line to the Board of Directors;

● To oversee the Company's compliance with legal and regulatory requirements and its code of ethics.

In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company and has the authority to engage and determine funding for independent counsel and other advisors as it determines necessary to carry out its duties and as permitted by law.

The Committee does not plan or conduct audits or determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. Management and the independent auditor are responsible for these activities.

The Committee shall review at least annually and update this charter as deemed appropriate.

* * *

## IV. RESPONSIBILITIES AND DUTIES

The Committee, in carrying out its responsibilities, believes its policies and procedures should remain flexible in order to best react to changing conditions and circumstances. The Committee should take appropriate actions to set the overall corporate "tone" for quality financial reporting, accounting, sound business risk practices and ethical behavior. The following shall be the principal responsibilities and duties of the Committee that may be supplemented from time to time as deemed appropriate by this Committee.

<u>General</u>

1. Discuss with management and the independent auditor the status of internal control recommendations made by the independent auditor and the

internal audit function. Review the internal reports to management prepared by the internal audit function and management's response.

2.     Discuss with management, the internal auditors and the independent auditor the adequacy and effectiveness of the accounting and financial controls; the policies and procedures to assess, monitor and manage risk; the investment policies, practices and programs; and the legal and ethical compliance programs.

Internal Audit

3.     Review and approve plans, annual budget, activities, staffing and organizational structure of the internal audit function, including its charter; Ensure there are no restrictions or limitations, which impact or impair the scope of the internal audit function's activities or their access to required information.

4.     Review and concur in the appointment, replacement or dismissal of the internal audit partner and out-sourced firm.

Independent Auditor

5.     Appoint, compensate, review the performance of, and retain or terminate the independent auditor with the independent auditor directly reporting to the Committee. Discuss with the independent auditor the overall scope and plans for their audit activities, including the adequacy of staffing.

6.     Pre-approve all audit and non-audit services provided by the independent auditor. The Committee may delegate pre-approval authority to a member of the Committee. The approved non-audit services shall not include any services prohibited by law or regulation.

7.     Oversee the work of the independent auditor, including resolution of any disagreements between management and the independent auditor regarding financial reporting.

8.     Actively discuss with the independent auditor any relationships or services that may impact the objectivity and independence of the independent auditor. Ensure that the independent auditor submit annually a formal written statement, including the written disclosures required by Independence Standards Board Standard No. 1, delineating all relationships between the independent auditor and the Company.

9.     Discuss with the independent auditor the nature of the independent auditor's internal quality control procedures, including any material issues raised by (a) the most recent internal quality control or peer review of the independent auditor or (b) any inquiry or investigation by the PCAOB or other governmental or professional authorities, within the preceding five years, with respect to one or

more independent audits carried out by the independent auditor, and any steps taken to deal with any such material issues such as those that would impact the independent auditor's ability to maintain its license to operate and function.

10.     Set clear hiring policies for employees or former employees of the independent auditor that meets the SEC regulations and NASDAQ listing standards.

Financial Reporting

11.     Review management's assertion on its assessment of the effectiveness of internal controls as of the end of the most recent fiscal year and the independent auditor's report on management's assertion.

12.     Review the Company's annual financial statements and any reports, including Form 10- K, or other financial information submitted to any governmental body, or the public, including any certification, report, opinion, or review rendered by the independent auditor.

13.     Oversee preparation of the Audit & Ethics Committee Report required by the rules of the SEC to be included in the Company's annual proxy statement.

14.     Review with management and the independent auditor the Company's quarterly financial statements prior to the release of earnings and prior to the filing of the Form 10-Q and the results of the independent auditor's review of the quarterly financial statements as required by Statement on Auditing Standards No. 71, *Interim Financial Information*.

15.     Review earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

16.     Review the charter and activities of the Company's Disclosure Committee and management's processes and resources to execute the responsibilities outlined in the Disclosure Committee charter.

17.     Review with management and the independent auditor critical accounting and reporting principles, practices and procedures selected and applied by the Company in preparing its financial statements. Discuss with the independent auditor those matters required to be discussed by AU Section 380, Communication with Audit Committees. Consider the independent auditor's judgments about the quality and appropriateness of the Company's accounting principles.

18.     Review major changes to the Company's accounting principles and practices as suggested by the independent auditor or management. Review all material alternative treatments of financial information within generally accepted

accounting principles that have been discussed between the independent auditor and management, including the ramifications of the use of such alternative treatments and disclosures and the treatment preferred by the independent auditor, and any other material written communications between the independent auditor and management.

19.     Review and discuss with management and the independent auditor any material financial or non-financial arrangements of the Company which do not appear in the financial statements.

20.     Review and approve all related party transactions for potential conflict of interest situations. "Related party transactions" refers to the transactions required to be disclosed pursuant to the SEC regulations.

21.     Discuss with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

22.     Review separately with each member of management, the independent auditor and the internal audit function any significant difficulties or disagreements encountered during the course of the annual audit, including any restrictions on the scope of work or access to required information.

Ethical and Legal Compliance

23.     Review the Company's Integrity Policy and management's system to publish, circulate and enforce the Integrity Policy.

24.     Review management's monitoring of the Company's compliance with its Integrity Policy, including any changes to or waivers of the Integrity Policy.

25.     Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by Company employees of concerns regarding accounting or auditing matters.

26.     Review, with the Company's counsel, legal compliance matters including violations of securities laws or breaches of fiduciary duty.

27.     Review, with the Company's counsel, any legal matter that could have a significant impact on the Company's financial statements.

28.     Review the charter and activities of the Company's Business Conduct and Ethics Committee.

29.     Perform any other activities consistent with this charter, the Company's by-laws and governing law, as the Committee or the Board of Directors deems necessary or appropriate.

Risk Management

30.     Discuss with management the significant business risks or exposures facing the Company; assess the steps management has taken or proposes to take to minimize such risks to the Company; and periodically review compliance with such steps.

31.     Review the Company's business continuity plan and key disaster recovery programs.

## C.     Control, Access, And Authority

92.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tellabs, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tellabs.

93.     Because of their advisory, executive, managerial, and directorial positions with Tellabs, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Tellabs.

94.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tellabs, and was at all times acting within the course and scope of such agency.

## D.     Reasonable And Prudent Supervision

95.     To discharge their duties, the officers and directors of Tellabs were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of Tellabs were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(d)     remain informed as to how Tellabs conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that Tellabs was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VI.     BREACHES OF DUTIES

96.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Tellabs and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Tellabs, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tellabs, the absence of good faith on their part, and a reckless disregard for their duties to Tellabs and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Tellabs.

97.     The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that the financial health of the Company was much stronger than it was.  In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of two class action

lawsuits that allege violations of federal securities laws. As a result, Tellabs has expended, and will continue to expend, significant sums of money to rectify the Defendants' wrongdoing.

## VII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

98.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

99.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the financial health of the Company was much stronger than it was. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

100.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider trading, and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

101.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

102.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII. DAMAGES TO TELLABS

103.    As a result of the Individual Defendants' wrongful conduct, Tellabs disseminated false and misleading statements.  The improper statements have devastated Tellabs' credibility.  Additionally, Tellabs is now the subject of two securities fraud class action lawsuits.  The Company will face substantial costs in connection with an investigation and the lawsuits.

104.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Tellabs' market capitalization has been substantially damaged.

105.    Further, as a direct and proximate result of the Individual Defendants' conduct, Tellabs has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

a.    $50.9 million spent to repurchase Tellabs' stock at artificially inflated prices;

b.    costs incurred in investigating and defending Tellabs and certain former officers in two class action lawsuits, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

c.    costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Tellabs and for compensation based at least in part on Tellabs artificially-inflated stock price and inflated revenues; and

d.    costs incurred from the loss of the Company's customers' confidence in Tellabs services.

106.    Moreover, these actions have irreparably damaged Tellabs' corporate image and goodwill.  For at least the foreseeable future, Tellabs will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

behavior and have misled the investing public, such that Tellabs' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

107.    Plaintiff brings this action derivatively in the right and for the benefit of Tellabs to redress injuries suffered, and to be suffered, by Tellabs as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment by the Individual Defendants. Tellabs is named as a Nominal Defendant solely in a derivative capacity.

108.    Plaintiff will adequately and fairly represent the interests of Tellabs in enforcing and prosecuting its rights.

109.    Plaintiff was a shareholder of Tellabs common stock at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Tellabs shareholder.

110.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

111.    The Board of Tellabs currently consists of the following eleven Defendants: Birck, Hedfors, Ianna, Kelly, Lavin, Marshall, Rossman, Strigl, Suwinski, Tobkin, and Williams.

### A.    Demand Is Futile Because the Defendants' Conduct Was Not a Valid Exercise of Business Judgment

112.    The Individual Defendants' decision to improperly account for the Company's costs, and to issue or approve improper statements about those costs and about the Company's corresponding financial performance, is not protected by the business judgment rule.  At the time of each decision, the Individual Defendants were at a minimum grossly negligent in authorizing such conduct due to accounting improprieties that would have been obvious and with reasonable diligence should have been uncovered before they permitted such improprieties to continue.

113.    The acts complained of constitute violations of fiduciary duties owed by Tellabs' officers and directors and these acts are incapable of ratification.  The Director Defendants signed the Company's SEC filings, authorized and/or permitted the improper statements therein

and disseminated the misleading information directly to the public. The Director Defendants are beneficiaries of the wrongdoing alleged herein and thus could not fairly and fully prosecute a lawsuit even if such a lawsuit were instituted by them, and therefore demand is futile.

**B. Demand Is Futile As To The Director Defendants Because They Face A Substantial Likelihood Of Liability**

114. Each Director Defendant faces a substantial likelihood of liability for his or her breaches of fiduciary duty. Each Director Defendant was a director during the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, each Director Defendant knowingly reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which each Director Defendant faces a substantial likelihood of liability. For this reason demand is futile.

**C. Demand is Futile as to Defendant Birck**

115. Additionally, Defendant Birck cannot render an independent decision because he is and was a high-ranking officer of Tellabs during the time period when the wrongdoing occurred. Defendant Birck co-founded Tellabs and has served in various high offices at Tellabs since 1975. For these reasons, Tellabs admits that Birck is not an independent director. Thus, Defendant Birck is a current Company insider and therefore cannot independently consider a demand.

116. Defendant Birck also faces a substantial likelihood of liability for insider trading. While an officer and director of Tellabs and in possession of material, adverse, non-public information, Defendant Birck sold 200,000 shares of Tellabs common stock for $1,400,000. Demand is futile for this additional reason.

### D. Demand Is Futile As To Audit Committee Defendants Ianna, Kelly, Lavin, Rossman and Suwinski

117.    Defendants Ianna, Kelly, Lavin, Rossman, and Suwinski face a substantial likelihood of liability for their misconduct as members of Tellabs' Audit Committee. These Defendants, as members of the Audit Committee, were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and Tellabs' internal controls over financial reporting. Despite these duties, Defendants Ianna, Kelly, Lavin, Rossman, and Suwinski knowingly or recklessly reviewed and approved false financial statements and press releases. Accordingly, these Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon these Defendants is futile.

### E. Demand is Futile As To The Insider Trading Director Defendants Birck & Marshall

118.    Defendants Birck and Marshall, because of their high-level positions at the Company, knew that the statements they made, authorized, or failed to correct were false and misleading when made. They also knew that the misstatements would create an inflated stock price. These defendants took advantage of this undisclosed information to sell their personally-held stock for considerably more than the stock was worth. Because Defendants Birck and Marshall received personal financial benefits from their insider trading transactions not received by other shareholders of the Company, they are unable to render a disinterested decision on whether to pursue these derivative claims.

### F. Demand Is Futile As To All Directors For Additional Reasons

118.    The Director Defendants authorized the Company to spend $50.9 million to repurchase 7.6 million shares during Q4 2010. The repurchases of the Company's stock, however, were at artificially inflated prices as a result of the false and misleading public

statements, press releases and filings with the SEC that misrepresented the Company's financial staements. Each of these defendants knew or was reckless in not knowing that the information the Company was disclosing was materially false and misleading when made, and that the Company's stock was artificially inflated. These decisions were not the product of valid business judgment.

119. If Tellabs' current officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this Complaint by D&O Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Tellabs against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Tellabs, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

120. Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Tellabs by prosecuting this action. Therefore, demand on Tellabs and its Board is futile and is excused.

121. Tellabs has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Against The Individual Defendants For Breach Of Fiduciary Duty

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    The Individual Defendants owed and owe Tellabs fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Tellabs the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

124.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

125.    The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  The Individual Defendants also allowed defendants to cause, or themselves caused, the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting.  The Director Defendants violated and breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith, and supervision by knowingly or recklessly authorizing and failing to halt the repurchase of shares while Tellabs' share price was artificially inflated as a result of false and misleading statements. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

126.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Tellabs has sustained significant damages.  As a result of the misconduct alleged herein, these Defendants are liable to the Company.

127.    Plaintiff, on behalf of Tellabs, has no adequate remedy at law.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

128.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Tellabs common stock on the basis of such information.

130.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Tellabs common stock.

131.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's stock price was artificially inflated.  The Insider Selling Defendants' sales of Tellabs common stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

132.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III

### Against All Defendants for Waste of Corporate Assets

119.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.     The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and was on-going throughout the

applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

121.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) directing Tellabs to repurchase millions of dollars of its own stock at artificially inflated prices; (ii) by paying bonuses to certain of its executive officers; and (iii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

122.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

133.    Plaintiffs, on behalf of Tellabs, has no adequate remedy at law.

**COUNT IV**

**Against The Individual Defendants For Unjust Enrichment**

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Tellabs.

136.    The Individual Defendants were unjustly enriched as a result of the compensation each of them received while breaching the fiduciary duties that each of them owed to Tellabs.

137.    Plaintiff, as a shareholder and representative of Tellabs, seeks restitution from these Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

138.    Plaintiff, on behalf of Tellabs, has no adequate remedy at law.

**X.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches of fiduciary duties, and unjust enrichment;

B.     Directing Tellabs to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tellabs and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Company's internal controls over the Company's financial reporting and statements;

- a proposal to strengthen the Board's supervision of major accounting decisions and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to strengthen the Company's insider trading controls;

- a proposal to strengthen the Company's repurchase of shares;

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Tellabs to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Tellabs' directors, executives and other employees; and

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters.

C.     Awarding to Tellabs restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**XI.     JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: March 19, 2013                                  JOHN NICHOLAS, Derivatively on behalf of TELLABS, INC.

/s/ Edward T. Joyce
_____
One of his attorneys.

Edward T. Joyce
Rowena T. Parma
THE LAW OFFICES OF
EDWARD T. JOYCE & ASSOCIATES, P.C.
135 South LaSalle Street, Suite 2200
Chicago, IL 60603
Telephone: (312) 641-2600
Attorney I.D. 47922

Frank J. Johnson
Shawn E. Fields
JOHNSON & WEAVER, LLP
110 West "A" Street, Suite 750
San Diego, CA 92101
Tel: (619) 230-0063

Attorneys for Plaintiff

## VERIFICATION

I, John F. Nicholas, hereby verify that I am a shareholder of Tellabs, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date: 03/16/2013

John F. Nicholas